32　451<br>82　692

WATSON, HEATHERINGTON and WIFE *v.* LEWIS PIPES, Ex'r, &c.

1. WILL: SIGNATURE TO.—Where the testator, being capable in law to make a will, has full consciousness of the act to be performed, and intends to do it, consents to have his hand guided by another in writing his signature to his will, and it is accordingly so written, it is a sufficient signing within the statute, whether his incapacity to write his name results from a want of education or from physical debility.

2. SAME.—If a third person, at the request of the testator, guide his hand in writing his signature to his last will and testament, it is equivalent to an actual signing by the testator himself, or at least to a signing by such third person by the express direction of the testator, within the meaning of the Statute of Wills.

3. WILL: PUBLICATION OF.—The formal publication of his last will and testament by the testator, is unnecessary; a will may be good, if in all other respects regular, without any words of the testator declaratory of the nature of the instrument, or any formal recognition of, or allusion to it. See 4 Kent, Com. 515; 2 Greenl. Ev. § 675; 1 Lomax, Ex'r, 26.

4. WILL: ATTESTATION.—A will must be attested in the presence of the testator; and the presence contemplated by the statute is not simply the bodily presence of the testator, but it is also essential that he be mentally capable of recognizing, and actually conscious of the act of attestation when performed. To be corporeally present, it is not indispensable that the testator and the witnesses be in the same room, or in the same house, or that he actually see them attest the will; it is sufficient if the attestation be within the scope of the testator's view, and where he could have seen the witnesses if he had desired to do so.

APPEAL from the Probate Court of Adams county. Hon. Reuben Bullock, judge.

A very full statement of the case will be found in the opinion of the court.

*Freeman* and *Dixon*, for appellants.

The appellants assign for error. 1st. That the pretended will was not written by the testator himself. 2nd. It was not signed by the testator himself. 3rd. It was not signed by any other person in his presence, by his express directions. 4th. It was not attested by three or more credible witnesses, in the presence of the testator. 5th. Testator did not see or hear the signing or attestation of the witnesses.

1. Wm. T. Martin, a subscribing witness to the will, testifies that he wrote the will himself.

2. All the witnesses testify that Anthony Smith, the deceased, *could not write*, nor could he *read nor sign his name.* Therefore, it is clearly established, not only that he did not write or sign the will himself, but that it was impossible for him to do so.

3. He did not direct any other person to sign the will for him.

It appears that both Fleming and Spring are subscribing witnesses with Martin; that they were present with Martin, and in the presence of Smith at the time that Martin says Smith requested him, Martin, to assist him, Smith, in signing the will, or to sign it for him; but neither of these witnesses heard testator utter a word during that day, except the word " yes," when Martin asked him if he was satisfied. As these witnesses were neither *deaf, dumb,* nor *blind,* but acted at the request of Mr. Martin, their united testimony must be regarded as superior evidence to his. The weight of evidence is clearly against Mr. Martin, and it is therefore established, that testator did not request him either to write testator's name to the will, or to assist testator in writing his own name.

Add to this the further proof that testator could neither *read, write,* nor *sign his name,* and that Martin admits himself ignorant of these facts, and it is clear, beyond doubt, that Smith did not write the will, did not sign it himself, did not request Martin to sign it for him; and that Martin did not sign it for him.

The statute provides that a will " must be signed by the testator, or by some other person in his presence, and by his express directions; and moreover, if not wholly written and subscribed by himself, be attested by three or more credible witnesses, in the case of

the devise of real estate, and one or more credible witnesses in case of the devise of goods and chattels, and personal estate, *in presence* of the *testator.*"

As the will was not signed by Smith nor by Martin, under the express directions of Smith, it is utterly void for all purposes.

Every requirement of the statute must be complied with, in the making and attestation of a will, or the same will be void. Each requirement of the statute is an essential ingredient in the proof, and these must be proved by those propounding the will for probate. *Reween* v. *Brinkerhoff,* 26 Wendell, 330.

In this case, the will was not read to the testatrix, in the presence of the witnesses, nor did she say it was her will in their presence; but testator signed it in the presence of the witnesses. This was held insufficient. Held to be void.

In *Chaffe* v. *Bapt. Miss. Convention,* 10 Paige, 86, 87, the subscribing witnesses went to the room of the decedent; she took the will out of a drawer; it had her name to it; and putting her finger on her name, said : "I acknowledge this to be my last will and testament," or words to that effect. She did not admit in their presence, that she had subscribed her name to the will, or that it had been subscribed thereto by any other person, by her direction. After the witnesses had subscribed their names to the will, she handed it to one of them, with a request that he would keep it, and he retained it accordingly, until it was delivered to the surrogate for probate, after her death. Held to be void.

To attest a will is the act of the *senses,* and is to know from the testator, that it was published as such, and to certify the facts required to constitute an actual and legal publication. To subscribe, is the act of the *hand,* and is for the purpose of identifying the paper. There may be an attestation without a subscribing. 1 B. Monroe, 117.

The Statute of Wills of Virginia is the same as ours, except that ours requires three witnesses to wills of real estate, and that of Virginia, two. In *Burnell* v. *Corbin,* 1 Rand. 143, *one* witness proved all the requirements of the statute, but the other did not. Witness Barrick, said, he was sent for, and went to the house of Burnell, found him sitting in bed, with said written paper in his hand,

when the said Burnell asked him to sign that paper, and thereupon he signed his name to said paper, as a witness, in the presence of said Burnell; that he then asked the said Burnell what it was he had signed, and said Burnell replied, "it is my last wil but you need not make a talk of it, it is time enough." Held to be insufficient.

In *Graybell* v. *Barr*, 5 Barr, Rep. 445, Henry Carpenter, one of the attesting witnesses, testifies that deceased said he could not write; he was too weak; witness did not hear testator request any one to write his name to the will; he merely saw him make his mark opposite the seal; did not hear deceased, or any one else, call it a will. It was not read while he was in the room. Christian Hess, the other witness, saw testator put his mark there. Witness put his name there, by his request; deceased could write. Held that the will was void.

In *Desay* v. *Hoover*, 5 Barr, Rep. 21, *et seq.*, held that signing a will by testator's mark, was not a compliance with the statute; it must be signed by testator, or by some one, at his request, in presence of all the witnesses. Ib. 25, 26.

4. The will was not attested by three or more credible witnesses, nor even by one witness.

The act of attestation, on the part of the witnesses, is to *know* the contents of the will, either from reading or hearing it read at the time of attestation, and to hear from the testator himself, that the provisions contained in the same constitute his will, at the time of attestation, and in the presence of all the witnesses. The mere act of subscribing the names of the witnesses, under directions of an attorney, is not an attestation—it is merely setting a mark of identification on the paper purporting to be a will. 1 B. Monroe, 117.

Was this will attested at all? We have already seen that the will was not signed in accordance with either provision of the statute. A will can only be signed in two ways, viz : by the testator himself, or by another for him, at his request, in the presence of three witnesses; as neither of these was done, it was impossible to attest the will. Spring, one of the subscribing witnesses, did not see the will signed at all, nor did he hear testator request any

one to sign it for him, or assist him to sign it. Fleming saw Martin put a pen in testator's hand, and assist him to sign his name, by guiding his hand ; but testator did not say that the paper signed contained his will. Neither. Spring nor Fleming heard Smith say that the paper contained his will, nor utter any word, except to say "yes." When Martin asked him if he was satisfied, he said "yes;" but Martin did not ask him if he was satisfied with that paper as his will, but only if he was "satisfied."

Martin says, "the will was not read over to testator in the presence of the witnesses, but witness did ask the testator in their presence whether it was his will," but testator did not reply to this question at all. Martin also says that testator did not speak of the signature, after it was made. All the witnesses agree then, that at the time of signing the paper by the witnesses, the testator did not declare the paper in question to be his will; and if no such declaration was made by the testator, the witnesses could not attest it as a will. It is true, Mr. Martin states that he was sent for as counsel to draw the will ; that he drew the will in accordance with the instructions of the testator, and that he read the will twice to testator, before the witnesses were called in; but Mr. Martin was then acting in the character of an *attorney* to draw the will and not as a *witness* to *attest* the will. After Mr. Martin had drawn the will to the satisfaction of the testator, his office of attorney ceased ; but the will was not *executed*—it is only *prepared for execution*—the testator might refuse to execute the will. Subsequent to the drawing of the will, Mr. Martin assumed the character of a *witness* to the pretended execution of the same. What did the testator say or do on this occasion ? *Nothing.* Suppose that instead of Mr. Martin, John G. Fleming, who was called on with Spring and Hinds Fleming to witness the will, had been a witness, would he have known from what occurred at the signing and attestation, that this paper was Smith's will. Clearly not. Martin then relied on his information as an attorney in drawing the will, and did not hear testator at the time of the signing, nor subsequently, publish the paper as his will.

Martin's testimony then only proves that he drew the will according to directions, but he did not attest its subsequent publica-

tion as a will.    But for the information he derived as an attorney, he would not have known that the paper contained the will of Smith.

5. The signing and attestation did not occur in view of the testator.

Spring says testator could not see the witnesses at the time of attestation.

Fleming says nothing on the subject, nor does Martin.

. The signing took place in the room, but there is no evidence that testator either heard or saw what was done.    The *onus* of this proof is on defendants in error.    Though the signing occurred in the room, if testator did not see it, it was not in his presence and is insufficient.    1 P. Williams, 740 ; 1 Maule & Selw. 294 ; Doug. 241.

6. It may be argued that Martin, in the room with testator and the witnesses stated, "this is Mr. Smith's will," but none of the witnesses say that this remark was in the hearing of testator, nor that he heard or assented to Mr. Martin's declaration.    The proof is that he said nothing in reply to Martin's remark, and as his mind was sound, and he could talk, the presumption is that he did not hear or admit that it was his will.

7. None of the witnesses say that the testator was in his right mind at the time of executing the will—all the testimony refers to an anterior period.    The *onus* of this proof is on those who propound the will.    26 Wend.

*Mr. Herretts*, for appellee.

The only questions counsel for the appellees can anticipate, as those the opposite counsel can possibly contemplate discussing in this cause, relate to the signing, and the attesting the will of Anthony Smith.    Were these acts performed in such a manner as to conform to the requirements of the statute ?

Was the instrument signed by the testator, or did another sign it by his direction ?    In either case, it is all that the law requires, and we think the evidence leaves no doubt on the subject.    Words of the purport of a direction were not necessary.    Signs, even intelligent acquiescence merely, was sufficient.    If there was any

sign, token or gesture in the conduct of testator indicating unequivocally a direction to Mr. Martin to sign the will, or if, being of that unmistakably sound state of mind, of which all the witnesses speak, when Mr. Martin tendered his assistance to steady and guide his hand, the testator yielded himself to such aid and guidance without expressing any dissent or opposition, this was a sufficient signing. But beyond this *mere* submission, it is evident that he was gratified at what was done; he, says one of the witnesses, expressed himself as "greatly satisfied," when the act was then just completed; and on the next day, more than once, referred to the execution of his will on the day previous, as a matter gratifying to himself, and with evident relief of mind, that it had been accomplished. 4 Wash. Cir. Court R. 269; 2 Green. on Evidence, 674.

These authorities hold, that when the testator submits to have his hand directed, it is equivalent to an express direction to sign his name; his *own consent* to be guided, being indeed equivalent to an express audible direction.

The adoption of the signature or seal, even printed, or if imprinted by another, is a sufficient signing and sealing. Shep. Touchstone, § 56; 2 Wheat. Sel. 873.

The other point referred to, is we think, of equally easy solution. Did the attestation of the will by the subscribing witnesses, meet the requirements of the statute. All the authorities are full to this position; that in the absence of fraud, in cases where the intention of the testator is evident, and the proposed will consistent therewith, or as is said by some, in cases of "a fair will," courts will not greatly regard mere technicalities; but will strongly incline to sustain such. We will not here refer to the many proofs, spread through the testimony of Mr. Martin, that the testator's intentions were embodied in this will—shown also, in the testimony of Mr. Moore, and corroborated by all the reasons he gave, during the drafting of the will by Mr. Martin, for the dispositions made of his property, in each separate article of that instrument.

We will not here refer to the positions taken below, in attacking the attestation by the subscribing witnesses, further, than as a guide for ourselves. The statute requires the subscribing

witnesses to sign the will "in presence of the testator." What shall sufficiently constitute this "presence," has been much discussed. It seems however settled, that if they subscribe as witnesses in the same room with the testator, it is considered so far in accordance with the statute, that the burthen of proof is thrown on those who would contest its sufficiency; while, if the witnesses subscribe it outside the same room in which the testator is at the time, it will devolve on those asserting the will to prove those facts which will make out the *constructive* presence of the authorities.

We might here pause, relying on the authorities sustaining this position, and the uncontested facts, that the witnesses did sign the will in the same room with the testator, within four or five feet of his bed side, and that he was in a position and circumstances in which he *could* see all that was doing by the witnesses, and for aught that appears to the contrary, did so see and observe. 4 Kent, 515; 2 Greenl. Ev. 676, 678; 1 Ib. 272; 5 Harr. & John. 480; Douglas, 241; 10 Bac. Abr. 493.

It is true, that there are two decisions which seem to militate against the doctrine of constructive presence, as recognized in the above authorities. That there are however but the *two*, so far as we know, rather proves the rule, than otherwise; and even these have been since disapproved by the very court in which one of them was rendered. *Neil* v. *Neil*, 1 Leigh, R. 6; *Moore* v. *Moore*, 10 Iredell, R. Though a majority of the court in *Neil* v. *Neil*, did thus qualify the previously established doctrine as to a *constructive* presence, yet it is only necessary to compare the able opinions of the minority with those of the majority of the court, to arrive at the conclusion, that the ground then assumed by the majority was unsupported by well established principles of construction. In *Nock* v. *Nock*, 10 Grattan, 118; *Orndorf* v. *Hummer*, 12 B. Mon., all the cases were reviewed, the doctrine in *Neil* v. *Neil*, and of *Moore* v. *Moore*, exploded, and the former well established principle, that a signing was in the "presence," if done where the testator *could* see, if he would; and that this would be presumed, when the witnesses signed in the same room with testator, without requiring proof that it was so.

If there was fraud, or if the signing was done clandestinely, though in the same room, we admit the potency of such objections, but their proof would rest with the contestants of the will. Here there is no such charge. We refer further to 2 Salkeld, R. 688, *et notis;* 3 Ib. 395; 1 M. & S. 296; 1 Brown, Ch. C. 99.

On the subject of *"publication,"* and attestation, it is sufficient that if the witnesses, on being informed of the nature of the instrument, do subscribe it, at the request of the testator. 1 Lomax on Ex. 26; 6 Bing. 310; 7 Ib. 457; 3 M. & P. 689; 5 Ib. 316; 6 Rand. 34; 3 Leigh, 145.

It may not be amiss here to add, that we do not propose to rely on a mere corporeal presence; that the presence of a testator in a state of insensibility, on a signing by witnesses, in the room with him, without his knowledge of the fact, at the time it was transpiring, would be a compliance with the statute. On the contrary, the authorities clearly require that the mind of the testator shall at the time of the subscribing, be cognizant of that fact, as well as his position such, that acting under the promptings of that mind, he may see the action of the witnesses, if he will.

These facts are patent on the face of the testimony. That he was advised of the necessity of having witnesses to his will, and also knew that Spring and Fleming, had been sent for; see testimony of Martin and Moore. That Martin asked him, if he wished these gentlemen to sign his will as witnesses, and he responded affirmatively. That testator was blind in the right eye; that he lay with his right side to the wall. That the witnesses signed the will on a small table, on the left side of testator, some four or five feet from the bed. That testator lay on his back, and that he could at the most, only have required to turn his head on his pillow to have the witnesses in full view. There is, and has been, no intimation or pretence that he was incapable of doing this, but to the contrary.

*R. North,* on same side.

The only questions presented for decision are, whether the will was signed and whether it was attested according to the requirements of the statute?

Watson et al. *v.* Pipes.

Was the instrument signed by the testator, or by another person by his express direction ? If it was not signed by the testator, it was signed by some other person, if signed at all. If signed by another person, did the testator expressly direct him to sign ? We think the evidence leaves no doubt upon the subject. Words of the purport of a direction were unnecessary. Signs were sufficient. If there was any token, sign, or gesture in the conduct of the testator indicating unequivocally a direction to Mr. Martin to sign the will, this was sufficient. 4 Wash. C. C. Rep. 269 ; 2 Greenl. Ev. 674.

These authorities hold that when the testator submits to have his hand directed, it is equivalent to an express direction to sign his name. So if his hand, with his own consent, be guided by another, it is equivalent to an express direction.

The adoption of the signature or seal, written, printed, or imprinted by another, is a sufficient signing or sealing. Sheppard's Touchstone, 56 ; 2 Wheaton's Selwyn, 873.

On the question of attestation ; the will was attested in the room in which the testator was, and he had a mental knowledge of the act. This was sufficient. 4 Kent, 515 ; 2 Greenl. Ev. 676, 678 ; 1 Ib. 272 ; *Orndorf* v. *Hummer*, 12 B. Monr. ; *Nock* v. *Nock*, 10 Grattan, 118.

It is not shown that the testator did not have the power of seeing the attestation.

On the subject of " publication," and the attestation, it is sufficient if the witnesses, on being informed of the nature of the instrument, subscribe it at the request of the testator. 1 Lomax, 26 ; 6 Bing. 310 ; 3 Mo. & P. 689 ; 7 Bray, 457 ; 5 Mo. & P. 316 ; 1 Cromp. & Mees. 140 ; 6 Rand. 34 ; 3 Leigh, 143.

SMITH, C. J., delivered the opinion of the court.

It appears from the record in this case, that at the April Term, 1852, of the Court of Probates of Adams county, an instrument in writing, which purported to be the last will and testament of one Anthony Smith, deceased, was produced and admitted to probate by said court.

And that in September, at a subsequent term of the court, the

appellants, Watson Heatherington and his wife, Jane, filed therein their petition, alleging for several causes, the invalidity of the will; and praying that an issue *devisavit vel non* be made up and transmitted for trial by a jury in the Circuit Court. The answers of the parties defendants being filed, an issue was accordingly drawn up and and certified to the Circuit Court of Adams county, in which a trial was had before a jury, who found that the said instrument in writing was "the true and valid last will and testament of" the deceased. Whereupon the petitioners entered their motion for a new trial, which being overruled they excepted.

When the proceedings of the Circuit Court in regard to the trial of the issue were certified to the Court of Probates, the petitioners again entered a motion for a new trial, assigning as grounds for the motion, First, The verdict was contrary to law and evidence: Second, The court erred in refusing instructions asked for by petitioners, and in granting those requested by the respondents; and Third, because of newly discovered evidence. This motion was refused, and a final decree entered, dismissing the petition; from which this appeal is prosecuted.

It is insisted that the evidence submitted to the jury, on the trial of the issue, was insufficient to sustain their verdict; and hence, that the court erred in overruling the motion for a new trial. This was the only ground relied on in the argument at bar.

In support of this objection it is contended, First, That the alleged will, as shown by the evidence, was not made and published in the mode prescribed by the statute; and Secondly, That the proofs did not establish a due attestation of the will.

The statute concerning last wills and testaments, provides that every person aged twenty-one years, if a male, or aged eighteen, if a female, or upwards, being of sound and disposing mind, and not a married woman, shall have power, at his or her will and pleasure, by last will and testament or codicil in writing, to devise all his or her estate in lands or personal property of every description whatsoever, which he or she hath at the time of his or her death, "so as such last will and testament be signed by the testator, or by some other person in his or her presence and by his or her express directions; and, moreover, if not wholly written and sub-

scribed by himself or herself, be attested by three or more credible witnesses, in case of the devise of real estate, and one or more credible witnesses in case of the devise of goods and chattels and personal property, in presence of the testator."

The evidence in reference to the questions discussed by counsel, is substantially as follows :—

The mental and legal capacity of the testator to make a will was clearly proved, and not questioned. William T. Martin, who prepared the will, testified that he was sent for by the deceased, and having arrived at his residence on the 2nd of April, 1852, received from him instructions for drafting the will in question. Witness conversed with the deceased before drafting the will. The deceased was clear and definite in all his instructions. The will was twice read over in the hearing of the deceased, and each clause was discussed by him. Wilson Spring and Hinds Fleming were called in to attest the will, and it was published and signed in the presence of the three witnesses, by the deceased, and they subscribed their names as witnesses thereto, in the presence of the testator, and upon a small table near his bedside. At the time of signature witness put a pen in the hand of the testator, and on seeing the trembling of his hand and the testator's saying that he could not write, and supposing him unable to write on account of physical debility, witness at the request of the testator, guided his hand as he wrote his name to the will. When the will was being prepared, witness informed the testator that three witnesses would be necessary : the testator requested witness to send for them, which was accordingly done, and that the subscribing witnesses, Fleming and Spring, were sent for and requested by witness to come into the testator's room and attest the will, upon the request of the testator. When the witnesses were all present, the testator with the assistance of witness, signed the will and requested that the same be attested as his will by the witnesses present, which they did in the presence of the testator and of each other. Witness held the will upon a book, where the testator could read and see it, put a pen in his hand which testator held, while witness guided his hand and kept it steady, until with witness's assistance, he signed the paper. The will was then attested by witness and

the other subscribing witnesses, as the will of the testator, on a table near the bed. When the will was signed the testator lay upon his back with his hands slightly inclined to the right, and propped up by pillows. The will was not read to testator in the presence of Fleming and Spring, but testator was asked by witness, in their presence, if it was his will. Testator did not speak of the signature thereto after it was made. Testator requested witness to sign his name to the will. The testator was illiterate, but the witness did not know whether he could read or write or sign his name. The testator was blind in the right eye.

Hinds Fleming testified that the testator signed "the will in issue" as his last will and testament, on the day of its date, in the presence of Wm. T. Martin, W. G. Spring, and witness. Witness, the said Martin, and Spring, at the same time, in the presence of the testator, and of each other, subscribed the paper as witnesses to the same, as the will of the testator. Witness was at the house of the testator, in company with his father and Spring, on the day the will was made. Martin first requested the two last to go into the testator's room to witness the will, when the father of witness excused himself on account of lameness; and at his suggestion witness was requested to go. When the witnesses were in testator's room, "Martin took the paper and told them it was Mr. Smith's will," who then signed it with Mr. Martin's assistance, who guided his hand. Witness did not hear the will read, and did not hear the testator acknowledge the paper to be his will after it was signed. Martin asked the testator if he was satisfied, to which he replied "yes." Witness did not hear the testator acknowledge the signature as his. The paper was attested on a table, about four or five feet from the testator's bed, who was lying on his back when the witness attested the will.

Spring, the third attesting witness, testified that he was at the testator's house on the second of April, 1852, in company with Hinds Fleming and his father; that Martin came out of the testator's room and requested witness and the elder Fleming to go into the room of the testator, and witness his will. The latter declined to do so, stating that he was in delicate health, and old, and did not wish to be compelled to attend court to establish the will.

Witness and Hinds Fleming, then went in. Martin took the paper in his hand and told the witnesses it was the testator's will. Witness did not read the will nor hear it read. "Martin put a pen in testator's right hand as testator lay in bed on his back, but did not see testator sign the paper." Witness could not see, from where he was standing, the will signed; did not hear the testator acknowledge the signature; nor hear him expressly direct Martin to sign the will for him. After attestation, Martin asked the testator if he was satisfied, to which he answered "yes." The will was attested by the subscribing witnesses, on a table four or five feet from the bed of the testator. He was not requested by the testator to witness the will, and did not hear him ask the other witnesses. The testator was blind in one eye; was illiterate, and could neither read nor write. Without changing his position in the bed, and he did not, the testator could not see the act of attestation by the subscribing witnesses, who signed the will, at the same time, immediately after Martin had assisted the testator to sign it. Witness did not hear the testator recognize the signature to be his "after Martin had helped him to sign" the will. Nor did he, either before or after he had attested the will, hear the testator acknowledge it to be his last will and testament. When Martin asked the testator, after the will was attested, if he was satisfied, he answered " yes," or something to that effect; and that was the only word spoken by the testator, which the witness heard during the transaction.

George Moore testified that he was "in and out" of the testator's room while the will was being drawn. The testator "was perfectly in his right mind." Martin asked the testator if he should assist him to write his name? The testator replied "yes." He did not know whether he could write or not. "The pen was in the testator's hand, and Martin steadied his hand." Martin told the testator that it would be necessary to have some persons as witnesses, and they were sent for. Witness heard "Martin ask the testator, in presence of the witnesses, if these gentlemen should sign the will, as witnesses," and the testator answered "yes." The will was attested on a table close by the bed side of the testator. The room in which he lay was a small one. Witness did not notice

if the testator looked at the witnesses while they were signing the will. When the will was signed the testator appeared pleased. On the day after the will was made, witness told the testator if he desired to do so, he could change it. He replied "no," he had made his will on "yesterday and was very well satisfied with it; and that it must remain as it was."

In consequence of the very earnest and labored argument of counsel for the appellants, we have been induced to extract, at some length, the evidence submitted to the jury on the trial of the issue, and which was subsequently reviewed by the Judge of Probates on the motion for a new trial made in his court.

Upon an examination of that evidence, it appears, in the first place, to be very distinctly shown that the will was written in the presence of the testator, and in conformity with specific instructions which he gave to the party who drew it up. The will having been twice read to him, he was fully acquainted with its contents. That persons were sent for by his direction, to act as attesting witnesses; and who knew when they assembled in the testator's room, the purpose for which their attendance was required; and that when there assembled, the person who drafted the will, in the presence of the testator, holding it in his hand, said to the witnesses that it was the testator's will. The same person then put a pen in the testator's hand, who was entirely illiterate and incapable of making his own signature; and at his request guided his hand as he wrote his name to the will.

In the argument, it was assumed that the signing was, in point of fact, not the act of the testator, but of Mr. Martin, who guided his hand. And as he was not expressly directed by the testator to sign his name to the will, it is insisted, that the statute was not complied with; consequently the execution of the will was void.

This position is clearly untenable. It is not to be controverted, that, within the meaning of the statute, the direction to sign the name of the testator, may be given by any words, or even signs which distinctly show that the testator desired and authorized the act to be done. The testator could in no way, more clearly indicate his wish that another should sign for him, than by requesting him to do so; and the request itself, conveyed full authority to

perform the act. The testator's hand, at his own request, was guided in making the signature. That was certainly, at the least, equivalent to an express direction to another to sign his name.

But, whatever it may have been in point of fact, the act of signing, upon strictly legal principles, was the act of the testator. He had full consciousness of the act to be done. He desired and intended to execute the will. By submitting to have his hand guided by another, as he made the signature, the act was none the less his own.

"A signature," (says Greenleaf,) "consists both of the act of writing a party's name, and of the intention of thereby finally authenticating the instrument. It is not necessary that a testator should write his entire name. His mark is now held sufficient. And if the signature is made by another guiding his hand, with his consent, it is held sufficient." 2 Green. Ev. § 674.

In *Stevens and Wife* v. *Vancleve,* where the testator, who was incapacitated by disease, from making his signature, consented to have his hand guided in signing his name, it was adjudged to be the act of the testator, and a sufficient signing, within the meaning of an Act, which, in this respect, is precisely similar to our own. 4 Wash. Cir. C. Rep. 262. The reasons upon which the rule is founded, manifestly, make it applicable to any case in which the testator, being capable in law to make a will, has full consciousness of the act to be performed, and intends to do it, whether his incapacity to write arises from ignorance, or is caused by accident or disease.

The next ground taken for the appellants, was, that the will was not published in conformity with the directions of the statute.

Publication is the act or acts of the party, by which he manifests that it is his intention to give effect to the paper, as his last will and testament. 2 Green. Ev. 561.

If the facts which the evidence establishes, were found by a special verdict, there might possibly be some very slight ground to doubt, as to the sufficiency of the publication, as in such event, this court would be precluded from drawing any inference from the facts contained in the special verdict, but would be confined strictly to a determination of the law arising upon those facts.

But as the jury found, generally, that the instrument submitted to their examination, was the valid last will and testament of the testator, the evidence submitted on the trial was unquestionably sufficient to authorize the presumption, that there was a due and legal publication of the will, although the evidence may not have directly established a formal and express publication.

Hence, if it were conceded that, under the statute, a formal publication is necessary to the validity of a will, we could not, legitimately, set aside the decree. But we apprehend, that, under the proper construction of the Act, a formal publication was unnecessary, and was therefore a question not involved in the issue.

The statute of this State, in respect to the question before us, was copied, literally, from the statute of Virginia, which was taken from the Statute of 29 Car. 2, Ch. 3. And it is settled, by authority, in England, that the formal publication of a will is unnecessary. A will may be good, under the Statute of Frauds, without any words of the testator declaratory of the nature of the instrument, or any formal recognition of it, or allusion to it. 4 Kent, Com. 515, and cases cited; 2 Green. Ev. § 675, and cases cited in note 5; 1 Lomax, Ex'ors, 26. It seems, that in all of the States, in which the provisions of the Statute 29 Car. 2, in regard to wills, have been adopted, the same doctrine is recognized. 4 Kent, 514, 515; 2 Green. Ev. § 675. The rule is based upon the plain and manifest construction of the statute; we, therefore, have no hesitation in adopting it.

In reference to the question of the illegality and insufficiency of the attestation, there is as little ground to question the propriety of the verdict, or the decree of the Court of Probates, dismissing the petition.

The object of the statute, in requiring that the witnesses shall subscribe their names in the presence of the testator, is, that he may have ocular evidence of the identity of the instrument attested as his will, and thus to prevent the fraudulent substitution of another.

The presence contemplated by the statute, is not simply the bodily presence of the testator; it is essential, that he be also mentally capable of recognizing, and actually conscious of the act

Watson et al. *v.* Pipes.

performed before him.   In the meaning of the law, to be corpore-
ally present, it is not indispensable that the testator and the wit-
nesses should be in the same room, or even in the same house, where
the attestation is made.   An attestation made in the same room
with the testator, is *prima facie,* good.   And where the attestation is
shown to have taken place in a different apartment, it is *prima
facie* bad.   But this presumption, in either case, will yield to posi-
tive proof.   And it is settled by all the authorities, that it is not
absolutely essential that the testator should actually see, but if the
attestation be shown to have been made within the scope of the
testator's view from his actual position, it will be sufficient.   For
example, when the testator, having a mental consciousness of the
act which is performed, in consequence of the position in which
he lies upon his bed, does not actually see the attesting witnesses
subscribe their names, the attestation will be good, provided he
had, the physical ability to change his position, and by doing so
could have seen the proceeding.   *Shires* v. *Glasscock,* 1 Ld. Raym.
507 ; *Doe dem. Wright* v. *Manifold,* 1 Maule & S. 294 ; *Capon* v.
*Dade,* 1 Br. Ch. C. 99 ; *Todd* v. *Winchelsea,* 2 Carr. & P. 488 ;
*Neil et al.* v. *Neil,* 1 Leigh, 6 ; *Knock* v. *Knock's Ex's,* 10 Grat-
tan, 106 ; Green, Ev. § 678 ; Lomax, Ex's, 29, 30.

These principles, applied to the evidence, fully justify the verdict
of the jury.

The testimony of the only witness relied on to show that the
will was not legally attested as a devise of real estate, was that of
Spring, one of the attesting witnesses.   According to his testi-
mony, at the time when the will was being attested, at the bedside
of the testator, the testator was lying upon his back, with his head
inclined to the right, so that he could not have seen the witnesses
while in the act of attestation.   But neither Spring nor any other
witness, stated that the testator was unable to change the position
of his head, so as actually to see the attesting witnesses subscribe
their names to the will.   This feature of the evidence distinguishes
the case before us from the case of *Neil* v. *Neil,* above cited.

In that case, it was proved that the position of the testator made
it impossible for him to see the witnesses while in the act of attesta-
tion, and that from extreme debility he was unable, without assist-

ance, to turn his face towards them. The attestation was adjudged insufficient by a majority of the court. But it was expressly conceded, that if the incapacity of the testator to change his position had not been proved, the attestation would have been good within the meaning of the statute. That case stands alone in Virginia; and it was said in *Nock* v. *Nock*, decided in the same court, that it was repudiated everywhere else. But if admitted to be authority, it would still be decisive against the appellants.

Decree affirmed.